## UNITED STATES v. PIERCE et al.

### (District Court, N. D. New York. November 7, 1917.)

1. WAR ⬤⟿4—ESPIONAGE ACT—OFFENSES—PUBLICATIONS.

   The circulation and distribution of pamphlets falsely charging unworthy motives to Congress in declaring that a state of war existed between the United States and Germany, exaggerating the horrors of war, inveighing against conscription, and falsely stating that a high governmental official had done unlawful acts so he had no time to prosecute food speculators, is a violation of the so-called Espionage Act June 15, 1917, c. 30, § 3, declaring that whoever, when the United States is at war, shall willfully make or convey false reports with intent to interfere with the operation or success of the military or naval forces of the United States or to promote the success of its enemies, shall be guilty of an offense, for the mere intent to interfere with the success of the military or naval forces of the United States is sufficient, though the false reports do not have such effect, and the obvious effect of such pamphlets would be to encourage its enemies and hinder the operations of the United States.

2. CONSTITUTIONAL LAW ⬤⟿90—WAR ⬤⟿4—FREEDOM OF SPEECH AND PRESS —SCOPE.

   Const. U. S. Amend. 1, declaring that Congress shall make no law abridging the freedom of speech or of the press, merely preserves the right to fairly criticize and comment, and does not justify lawlessness; therefore the so-called Espionage Act June 15, 1917, c. 30, § 3, denouncing the offense of willfully making or conveying false reports with intent to hinder the operation or success of the military or naval forces of the United States or to promote the success of its enemies is valid, and the circulation of pamphlets containing false and misleading statements calculated to have that effect cannot be justified as an exercise of freedom of speech or political argument.

3. WAR ⬤⟿4—ESPIONAGE ACT—OFFENSES—JURY QUESTION.

   In a prosecution under the so-called Espionage Act June 15, 1917, c. 30, § 3, for circulating of pamphlet containing false reports, it is a question for the jury whether the statements, if false, were willfully made with intent to hinder military operation of the United States or promote the success of its enemies.

4. WAR ⬤⟿4—ESPIONAGE ACT—OFFENSES—INTENT.

   In a prosecution under the so-called Espionage Act June 15, 1917, c. 30, § 3, intent to hinder military operations of the United States or promote the success of its enemies may be inferred from the character of the false statement and the circumstances of the circulation.

5. CRIMINAL LAW ⬤⟿312—INTENT—PRESUMPTION.

   Intent is a question of fact, every sane person being presumed to intend the natural and probable consequences of his words and acts.

6. CONSPIRACY ⬤⟿43(6)—INDICTMENT—SUFFICIENCY.

   An indictment charging that plaintiffs throughout the period of time from the 6th day of April, 1917, to the day of the finding and presentment of the indictment and during which period the United States had been at war, within the Northern district of New York and Albany, unlawfully and feloniously conspired, combined, confederated, and agreed together to interfere with, prevent, hinder, and delay the execution of certain laws of the United States, setting them forth, and that during the period of conspiracy it was agreed that each of the defendants should discourage, obstruct, and prevent the prosecution by the United States of war with Germany, and further alleged that the offenses were committed in the city of Albany, is sufficiently definite; it not being necessary to specify the exact place where the conspiracy was formed or the exact time, a continuing conspiracy being charged.

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

7. WAR ⬅➡4—ESPIONAGE ACT—OFFENSES—"OBSTRUCT."

Under the so-called Espionage Act June 15, 1917, c. 30, § 3, which declares that whoever, when the United States is at war, shall willfully make or convey false reports or false statements with intent to interfere with the operation or success of the military or naval forces of the United States or to promote the success of its enemy, shall willfully cause or attempt to cause insubordination, disloyalty, mutiny, or refusal of duty in the military or naval forces of the United States, or shall willfully obstruct the recruiting or enlistment service of the United States to the injury of the service, shall be punished, three classes of offenses are denounced, the first consisting of the making of false reports or statements with the specified intent, the second for willfully attempting to cause disloyalty, and the third in willfully obstructing the recruiting or enlistment service of the United States to the injury of the service; and it is no defense to a prosecution for willfully obstructing the recruiting or enlistment service to the injury of the United States that there was no actual prevention of enlistment or compliance with draft legislation, for obstruction does not necessarily mean prevention, and the act was leveled at persons who should attempt to prevent enlistment, etc.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Obstruct.]

8. WAR ⬅➡4—ESPIONAGE ACT—OFFENSES—SCOPE—"INJURY TO SERVICE."

Under such section, the expression to "the injury of the service" of the United States refers to the prevention of enlistment, etc., and hence an indictment charging willful dissemination of false reports, and the willful attempting to cause insubordination, etc., need not allege that it was to the injury of the service of the United States.

9. CONSTITUTIONAL LAW ⬅➡90—FREEDOM OF SPEECH—POLITICAL PARTIES.

Citizens have a right to criticize existing laws and advocate their amendment or repeal, but they have no right to encourage and solicit resistance to the execution of laws, and such counsel and solicitation cannot be justified on the ground that it was a dissemination of arguments in favor of a political party.

At Law. Clinton H. Pierce and others were indicted for conspiracy under Criminal Code (Act March 4, 1909, c. 321), § 37, 35 Stat. 1096 (Comp. St. 1913, § 10201), and also violations of the so-called Espionage Act, §§ 3 and 4. On demurrer. Demurrer overruled.

See, also, 245 Fed. 888.

D. B. Lucey, U. S. Atty., of Ogdensburgh, N. Y.
Frederick A. Mohr, of Auburn, N. Y., for defendants.

RAY, District Judge. Since April 6, 1917, the United States has been at war with the Imperial German Government, on which day the Congress of the United States by joint resolution duly approved stated:

"That the state of war between the United States and the Imperial German Government which has thus been thrust upon the United States is hereby formally declared," etc.

May 18, 1917, Congress enacted what is commonly and popularly known as the Selective Draft Act (Act May 18, 1917, c. 15), approved that day. This act provides for the increase of the regular army, the enlistment of men in the military service of the United States, and the drafting of men for the purpose. This was done to enable the United

States to prosecute the war thus thrust upon us to a successful determination. June 15, 1917, Congress enacted what is commonly known as the Espionage Act (Act June 15, 1917, c. 30), approved that day, and which is entitled "An act to punish acts of interference with the foreign relations, the neutrality and the foreign commerce of the United States, to punish espionage and better to enforce the criminal laws of the United States, and for other purposes." Section 3 of this act reads as follows:

"Whoever, when the United States is at war, shall willfully make or convey false reports or false statements with intent to interfere with the operation or success of the military or naval forces of the United States or to promote the success of its enemies and whoever, when the United States is at war, shall willfully cause or attempt to cause insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States, or shall willfully obstruct the recruiting or enlistment service of the United States, to the injury of the service or of the United States, shall be punished by a fine of not more than $10,000 or imprisonment for not more than twenty years, or both."

[1] It is seen at a glance that whoever, when the United States is at war, willfully makes or conveys false reports or false statements with intent to interfere with the operation or success of the military or naval forces of the United States, or to promote the success of its enemies, commits a crime against the United States. It is not necessary that the operation or success of the military or naval forces be actually interfered with, or that the success of its enemies be actually promoted. The making or conveyance of false reports or false statements with the intent to interfere with the operation or success of either the military or naval forces of the United States or to promote the success of the enemies of the United States is all-sufficient.

The defendants have extensively circulated and spread broadcast a printed pamphlet or circular containing, with other things, the following:

"Conscription is upon us; the draft law is a fact!

"Into your homes the recruiting officers are coming. They will take your sons of military age and impress them into the army;

"Stand them up in long rows, break them into squads and platoons, teach them to deploy and wheel;

"Guns will be put into their hands; they will be taught not to think, only to obey without questioning.

"Then they will be shipped through the submarine zone by the hundreds of thousands to the bloody quagmire of Europe.

"Into that seething, heaving swamp of torn flesh and floating entrails they will be plunged, in regiments, divisions and armies, screaming as they go.

"Agonies of torture will rend their flesh from their sinews, will crack their bones and dissolve their lungs; and every pang will be multiplied in its passage to you.

"Black death will be a guest at every American fireside; mothers and fathers and sisters, wives and sweethearts will know the weight of that awful vacancy left by the bullet which finds its mark.

"And still the recruiting officers will come; seizing age after age, mounting up to the elder ones and taking the younger ones as they grow to soldier size;

"And still the toll of death will grow.

"Let them come! Let death and desolation make barren every home! Let the agony of war crack every parent's heart! Let the horrors and the miseries of the world-downfall swamp the happiness of every hearthstone!"

To this is added:

"Then perhaps you will believe what we have been telling you! For war is the price of your stupidity, you who have rejected Socialism!"

Then, after referring to the war and its horrors, we find the following:

"You cannot avoid it; you are being dragged, whipped, lashed, hurled into it; your flesh and brains and entrails must be crushed out of you and poured into that mass of festering decay."

To this is added:

"It is the price you pay for your stupidity—you who have rejected Socialism!"

Then, after referring to food prices, we find the following:

"The Attorney General of the United States is so busy sending to prison men who do not stand up when the Star Spangled Banner is played, that he has no time to protect the food supply from gamblers."

Then later:

"We are beholding the spectacle of whole nations working as one person for the accomplishment of a single end—namely, killing.  *   *   *

"We have been telling you all for, lo, these many years that the whole nation could be mobilized and every man, woman and child induced to do his bit for the service of humanity; but you laughed at us.

"Now you call every person traitor, slacker, pro-enemy, who will not go crazy on the subject of killing; and you have turned the whole energy of all the nations of the world into the service of their kings for the purpose of killing, killing, killing.

"Why would you not believe us when we told you that it was possible to co-operate for the saving of life?

"Why were you not interested when we begged you to work all together to build, instead of to destroy? To preserve, instead of to murder?

"Why did you ridicule us and call us impractical dreamers when we prophesied a world-state of fellow-workers, each man creating for the benefit of all the world, and the whole world creating for the benefit of each man?

"Those idle taunts, those thoughtless jeers, that refusal to listen, to be fair-minded, you are paying for them now.

"Lo, the price you pay! Lo, the price your children will pay! Lo, the agony, the death, the blood, the unforgettable sorrow—the price of your stupidity!  *   *   *

"VII. For this war—as every one who thinks or knows anything will say, whenever truth telling becomes safe and possible again—this war is to determine the question, whether the chambers of commerce of the allied nations or of the Central Empires have the superior right to exploit undeveloped countries.

"It is to determine whether interest, dividends and profits, shall be paid to investors speaking German or to those speaking English and French.

"Our entry into it was determined by the certainty that if the allies do not win J. P. Morgan's loans to the allies will be repudiated, and those American investors who bit on his promises would be hooked."

We have here, not only lurid and exaggerated pictures of the horrors of war, possible and impossible, but many false statements calculated to incite opposition to the war and opposition to the government and also calculated to interfere with the morale of our armies, discourage enlistments, registration, and willing service in our armies, and encourage desertion. These false statements are also calculated

to encourage our enemies and discourage and intimidate our own citizens and soldiers, and thereby promote the success of our enemies. It is not true that the recruiting officers will take our sons of military age and "impress them into the army." It is not true that, "You are being dragged, whipped, lashed, hurled into it" (the army or the war). It is not true that, "The Attorney General of the United States is so busy sending to prison men who do not stand up when the Star Spangled Banner is played, that he has no time to protect the food supply from gamblers." The Attorney General of the United States is not doing anything of the kind. It is not true that, "We are beholding the spectacle of whole nations working as one person for the accomplishment of a single end—namely, killing." It is not true that, "Now you call every person traitor, slacker, pro-enemy who will not go crazy on the subject of killing; and you have turned the whole energy of all the nations of the world into the service of their kings for the purpose of killing, killing, killing." It is not true that, "Our entry into it (this war) was determined by the certainty that if the allies do not win J. P. Morgan's loans to the allies will be repudiated and those American investors who bit on his promises would be hooked." Here is a plain assertion to every intelligent mind that the declaration of war to which reference has been made contains a falsehood, and that such declaration was made because of the fear that the allies might not win, and that in such case J. P. Morgan's loans to the allies would be repudiated, payment refused, and that American investors would lose their loans and suffer loss. In other words, that our entry into this war with Germany was determined upon by Congress to insure, if possible, the success of the allies, to the end that they would fulfill their contracts and pay the loans made them by individuals in the United States. The purposes and motives of our President and of Congress are impugned and grossly misrepresented and falsified. What reports or statements can be more or better calculated to interfere with the operation and success of our military and naval forces in this war, or more or better calculated to promote the success of the enemies of the United States?

[2-5] It is said, first, this pamphlet is an argument in favor of Socialism and of the Socialistic party; and, second, that such publications are proper and allowable under our Constitution, which prohibits curtailment of freedom of speech and of the press.

The first amendment to the Constitution of the United States provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

If this means that every man and woman in the United States in times of war and national peril may falsely state or say in words, or by means of pamphlets and writings printed and spread broadcast, anything and everything he pleases, however injurious to the general welfare and however grossly false the statements and however detrimental to the success of our military and naval forces the falsehood may be, and that Congress is powerless to enact a law abridging this right, then

the law under consideration is unconstitutional except in so far as it merely prohibits the circulation and distribution of such pamphlets containing the false reports and false statements of the nature described. In Warren v. United States, 183 Fed. 718, 721, 106 C. C. A. 156, 159 (33 L. R. A. [N. S.] 800) the Circuit Court of Appeals, Eighth Circuit, said:

"Liberty and freedom of speech under the Constitution do not mean the unrestrained right to do and say what one pleases at all times and under all circumstances," etc.

In United States v. Toledo Newspaper Co. (D. C.) 220 Fed. 458, it is held that the constitutional guaranty of freedom of the press is not infringed by summary process and conviction of contempt for publication tending to obstruct the administration of justice. If this be correct, why may not Congress enact a law making it an offense to make and spread broadcast, when a state of war exists, pamphlets containing materially false statements which are intended to interfere with and obstruct the lawful raising and organization of armies and the military operations of the government and which pamphlets are calculated to have that effect? Suppose a man goes out and publicly advocates by means of false statements the overthrow of our national government, the disbandment of our lawfully created national armies, organized for national defense in time of war, and puts his false declarations and statements in pamphlet form and circulates them, can it be doubted that Congress may constitutionally prohibit such acts? In State v. Pape, 90 Conn. 98, 96 Atl. 313, it is held:

"Liberty of speech and of the press is not license, not lawlessness, but the right to fairly criticize and comment."

See, also, Ex parte Bird, 5 Porto Rico, 241.

In Turner v. Williams, 194 U. S. 279, 294, 24 Sup. Ct. 719, 724 (48 L. Ed. 979) Mr. Chief Justice Fuller said:

"The flaming brand which guards the realm where no human government is needed still guards the entrance; and as long as human governments endure they cannot be denied the power of self-preservation as that question is presented here."

The act of Congress in question here is one obviously enacted and necessary for the preservation of our government and the enforcement of its rights. In my judgment to deny its constitutionality is to deny to the government of the United States the power of self-preservation by suppressing the publication and distribution of false statements made with the intent to destroy the morale and efficiency of our armies when engaged in lawful warfare, and prevent or interfere with their lawful organization and the lawful recruiting thereof. Such publications give aid and comfort to the enemy.

If a jury on evidence should find that this pamphlet contains false statements calculated to discourage our armies and enlisted men, discourage compliance with our draft laws, and interfere with their enforcement, or impair the morale of our armies, and that it was the intent of the writer and distributor to bring about such results, can it be justified on the theory that our Constitution warrants and protects the making of such false statements disseminated for such a purpose?

I think not. Freedom of speech and of the press does not give liberty to the individual to prevent or interfere with the preservation of our government, or the organization and success of our armies, and this may not be done under the guise of advocating the principles of a political party or the principles of Socialism. In the instant case, the language employed and contained in this pamphlet is for the consideration of the jury, and it will be for the jury to say whether or not the statements made, if proven to be false, were willfully made with intent to interfere with the operation or success of our military or naval forces, or to promote the success of our enemies, or willfully attempt to cause insubordination, or refusal of duty in such forces of the United States.

This intent may be inferred from the nature and character of the false statements made and promulgated and the surrounding circumstances and conditions, and on a consideration of the conditions under which made and of the persons to whom made. The false statements must be willfully made, and their making and promulgation must be accompanied by the intent specified. Intent is a question of fact. Every sane person is presumed to intend the natural and known consequences of his acts voluntarily and knowingly done and of words used.

It is for the jury to say, or will be, probably, under all the evidence in the case, if proof is given tending to sustain the allegations of the indictment, whether the defendants in spreading and distributing these pamphlets were merely advocating the principles and doctrines of the Socialistic party, or were attempting to discourage the war, enlistments, and recruiting, and impair the morale of our army, and thereby interfere with the operation and success of the military and naval forces of the United States to the injury of the United States, and intended so to do.

Depicting the horrors of war, the devastation of country and destruction of life and property caused by war, may present an argument against engaging in war unnecessarily—a reason for not doing so —but when coupled with materially false statements and representations as to what the officers and representatives of the government are doing and as to why the war was engaged in or declared by the law-making body of the nation, the realm of legitimate argument and free speech is departed from, and a question of fact is presented for the decision of a jury whether the horrors of war were depicted and the false statements made to advance and promulgate the principles of a political party or to interfere with and destroy the efficiency of our armies and interfere with the operation and success of our military and naval forces and promote the success of the enemies of the United States. It must be that "free speech" and "freedom of the press" has its limitations and do not include and protect the making and promulgation of false statements knowingly made with intent to destroy our armies in time of war and interfere with and prevent the enforcement of our laws.

[6-8] It is urged that the conspiracy counts are insufficient, in that they do not charge what the conspiracy was, or what the conspirators were to do. The indictment charges that "throughout the period of time from the 6th day of April, 1917, to the day of the finding and

presentment of this indictment" (October 25, 1917), the United States has been at war, and that "during said period of time the defendants," naming them, within the Northern district of New York at Albany, N. Y., "unlawfully and feloniously have conspired, combined, confederated, and agreed together * * * to interfere with, prevent, hinder, and delay the execution of certain laws of the United States, to wit." These laws are then specifically named and pointed out. It is charged to have been a continuing conspiracy commencing on a day certain and continuing in force and operation down to the date of the indictment. The indictment then charges "that during said period of time"—that is, from the beginning to the end thereof—the conspiracy was that each of said defendants "should and would discourage, obstruct, and prevent the prosecution by the United States of said war between the United States and the Imperial German Government, and prevent, hinder, and delay the execution of said laws (the ones specified and pointed out) above enumerated, by personal solicitation, public speeches, and various pamphlets which they should and would distribute and circulate, intending and attempting to cause and influence various persons available for military duty to fail to register and to refuse to submit to registration and draft for service in said military and naval forces and to fail and refuse to enlist for service therein," etc. Then follows the charge of overt acts in execution of such conspiracy. Nothing is said to the effect that the conspiracy includes the use or distribution of pamphlets containing false or untrue statements, but it is charged that defendants conspired to willfully cause and attempt to cause insubordination and refusal of duty, etc. The pamphlet is attached to and made a part of the indictment. Certain parts are quoted in the body of the indictment, and the statements quoted and other parts are alleged to be false.

It is urged by defendants that the statements of fact contained in the pamphlet are but the expression of an opinion, as, for instance: "Into your homes the recruiting officers are coming. They will take your sons of military age and impress them into the army." The word "impress," in connection with the creation of an army, implies the use of force, and the words of the pamphlet may be found to be calculated and intended to create the belief that recruiting officers are going and do go into our homes and by force, and without any preliminary selection for military service in accordance with law, seize and force into the army and navy the sons of our citizens. The statement is calculated, and may have been intended, to create a feeling against recruiting, the selective draft act, and the officials of the government. Such statements inspire resistance and strengthen the determination of those disposed to be at all recalcitrant. It may be that there is no direct statement that one is in duty bound to resist, but it is plainly taught and indicated that it will be to the interest of many, if not all, to resist. Is the quoted statement a mere expression of opinion as to what is being done or is to be done? Is it not a bald statement of what is being done and is to be done under a law of Congress which justifies no such act by a recruiting officer? Then take this statement, "The Attorney General of the United States is so busy sending to

prison men who do not stand up when the Star Spangled Banner is played that he has no time to protect the food supply from gamblers."

Is this an expression of opinion merely, or is it a bold, bald assertion that a fact exists, that a thing has been done and repeatedly done by the highest law officer of the national government without warrant of law? Is it not an assertion well calculated to excite hatred of this high official of the government, by asserting that he is doing unlawful acts and so busily engaged in the doing that he pays no attention to the enforcement of laws providing for food conservation? Such statements are likely to be given credence in certain localities by certain classes, and so incite opposition to the government and opposition to law and its enforcement. It seems clear to me that these and other statements above quoted and found in the pamphlet are to be considered by the jury, which is to determine their truth or falsity, the willfulness of the act, and the intent and purpose of the ones who made and promulgated them.

Section 3 of the so-called Espionage Act, hereinbefore quoted, clearly points out three classes of acts constituting offenses thereunder. The first consists in the willful making or conveying false reports or statements with the intent specified. The second consists in willfully causing or attempting to cause insubordination, disloyalty, mutiny, or refusal of duty in the military or naval forces of the United States. The third consists in willfully obstructing the recruiting or enlistment service of the United States to the injury of the service of the United States. It may be a question whether the making and conveyance of false reports and statements with intent to interfere with the operation or success of the military or naval forces of the United States, or to promote the success of its enemies, must be accompanied by an intent and purpose to injure the service of the United States, and whether such false reports and statements must be of a nature or character which would injure the service of the United States. So it may be a question whether one who willfully causes or attempts to cause insubordination, disloyalty, mutiny, or refusal of duty, must intend and purpose to injure the service of the United States. In short, do the words "to the injury of the service of the United States" relate back to and qualify each of the clauses of the section? Must the indictment allege, and must the government prove, not only that the United States is at war, and that the false reports and statements were made and conveyed with intent to interfere with the operation or success of the military or naval forces, but that such acts actually resulted either in injury to the service of the United States or were intended so to do?

This is true as to obstructing the recruiting and enlistment service as the section so says in plain terms. But the obstruction need not be physical and all obstruction of such service is injurious to the service of the United States. Obstruction does not necessarily imply prevention. The flowing stream of water may be obstructed, and often is, while its continuous onward flow is not wholly prevented, and its ultimate onward flow may not be prevented at all. Any and all acts and words or writings that interfere with the operation or success of

the military or naval forces of the United States, and all attempts, successful or unsuccessful, by acts, words, or writings, to cause insubordination, disloyalty, mutiny, or refusal of duty in the military or naval forces of the United States in time of war, work to the injury of the service of the United States. When Congress wrote into section 3, above quoted, the words "or shall willfully obstruct the recruiting or enlistment service of the United States, to the injury of the service or of the United States," it may have had in mind the hundreds and thousands of cases where fathers and mothers and brothers and sisters will obstruct in a way and to an extent the recruiting and enlistment service by urging and soliciting their sons and brothers not to enlist. No one will contend, I think, that such an act will be held a willful obstruction of the enlistment service to the injury of the service of the United States within the intent and meaning of section 3 of the act under consideration. But should some third person go about soliciting and urging young men not to enlist, extravagantly and untruly depicting the horrors and dangers and consequences of war, impugning the motives and purpose of the President and Congress in declaring war, and misrepresenting the objects sought to be attained by our government in declaring the existence of a state of war, we have a case where a jury well may find a willful obstruction of the recruiting or enlistment service of the United States to the injury of the service of the United States, even if the government is unable to prove that a single person was induced by such acts not to enlist when otherwise he would have enlisted.

Counts 1 and 2 of the indictment charge conspiracy. The other counts charge the offenses specified in section 3 of the so-called Espionage Act, and charge the making and conveyance of false reports, etc., and the willful attempting to cause insubordination, etc., in two ways—"to the injury of the service of the United States" and also in another count without this clause. I think either count sufficient in law. The count which charges the willful obstruction of the recruiting and enlistment service also charges that it was done to the injury of the United States, and is clearly sufficient.

The indictment seems to have been drawn with care and with abundant caution and is sufficiently definite as to time and place. The places where these offenses are alleged to have been committed is the city of Albany in the Northern district of New York. The time is specified. It was not necessary to specify the street and number of the house or business place where the conspiracy was formed, or to charge that it was formed on a particular day specified to the exclusion of other days, inasmuch as it is charged as a continuing conspiracy commencing on a day specified and continuing in effect and operation each day down to the time of the finding of the indictment. It was not necessary to set out what each alleged conspirator said. A conspiracy may be established by proving the acts of the alleged conspirators done within and during a specified time, all the defendants working in concert to bring about a certain unlawful result. It may not be possible, and it is unnecessary, to prove the words spoken by the alleged conspirators in forming the alleged conspiracy, provided the acts done by them and proved show concert of action by the partici-

pants necessarily tending to the joint consummation of the specified crime.

[9] Citizens have the right to criticize the existing laws, point out their defects, injustice, and unwisdom, and advocate their amendment or repeal; but they have no constitutional right to counsel, advise, encourage, and solicit resistance to the execution of or refusal to obey them. A political party and its individual members may advocate the repeal of existing laws, their amendment and improvement, and point out defects, and a political party may be formed for this very purpose. However, a so-called political party may not be formed to resist the execution of existing laws claimed to be unwise, unpatriotic, and oppressive, and its members permitted to encourage and advocate resistance to their due execution because of their membership therein. The willful resistance to the execution of a valid law may be made a crime, as may the willful obstruction of its enforcement. Any and all resistance and any and all obstruction to the operation or enforcement of a law may be declared an offense. It is the duty of all persons to obey the law and in lawful ways when called upon by due authority to aid in its enforcement. If this is not true, no government can survive.

I find no ground for sustaining the demurrer to the indictment or to any count thereof, and same is overruled.

4. INDICTMENT AND INFORMATION ⬿121(1)—BILL OF PARTICULARS—DISCRETION OF COURT.
    The granting or refusing of a bill of particulars rests in the sound discretion of the court.

⬿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes