UNITED STATES v. PRIETH et al.

(District Court, D. New Jersey. August 1, 1918.)

1. ARMY AND NAVY ⬦�longdash40—ESPIONAGE ACT—CONSTRUCTION—"OBSTRUCT."

Espionage Act, tit. 1, § 3, applies to conspiracy to obstruct recruiting and enlistment service of United States by printing, circulating, and distributing newspaper articles persuading eligible persons throughout United States not to enlist, since anything which would impede, hinder, or embarrass recruiting service would "obstruct" it.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Obstruct.]

2. STATUTES ⬦⟶184—CONSTRUCTION.

A construction will not be adopted which attributes to Congress an intent inconsistent with manifest purpose of act, unless language used clearly requires it.

3. ARMY AND NAVY ⬦⟶40—ESPIONAGE ACT—CONSTRUCTION.

Espionage Act, tit. 1, § 3, is not, as construed in instant case, an act to regulate the press; the press having no more of a constitutional right, when the country is at war, to willfully induce available persons not to join army and navy, than an individual has to urge persons not to enlist, etc.

4. ARMY AND NAVY ⚖40—COMPULSORY SERVICE—"THE RECRUITING OR EN-
LISTMENT SERVICE OF THE UNITED STATES."

Obstruction of the "draft" is a violation of Espionage Act, tit. 1, § 3,
as well as obstruction of voluntary enlistment; the expression "the re-
cruiting or enlistment service of the United States" applying to both the
service created by Selective Service Act and that which has to do with
voluntary enlistment.

5. ARMY AND NAVY ⚖20—SELECTIVE SERVICE ACT—"ENLISTMENT."

Since Selective Service Act, § 6, speaks of "enlistment" in connection
with the compulsory service therein provided for, and section 7 speaks
of "voluntary enlistment," an intention is shown to use the term "en-
listment" in a broad and comprehensive sense.

[Ed. Note.—For other definitions, see Words and Phrases, First and
Second Series, Enlistment.]

6. ARMY AND NAVY ⚖40—"ENLISTED."

One becomes "enlisted" in the military or naval service, whether he
volunteers or is drafted.

[Ed. Note.—For other definitions, see Words and Phrases, First and
Second Series, Enlist.]

7. ARMY AND NAVY ⚖40—OBSTRUCTING DRAFT—STATUTE.

Penal Code, § 37 (Comp. St. 1916, § 10201), applies only to conspiracies,
and does not cover the case of one, acting alone, who induces another to
fail to register pursuant to the Selective Service Act.

8. ARMY AND NAVY ⚖40—OBSTRUCTING DRAFT—INDICTMENT.

Indictment for conspiracy to violate Espionage Act, tit. 1, § 3, charging
conspiracy subsequent to June 15, 1917, to induce persons liable to service
under Selective Service Act to refuse to submit to registration, held to
charge a conspiracy to induce persons who failed to register at time set
by President's proclamation not to register under Selective Service Act,
§ 5, making provision for subsequent registration.

9. CRIMINAL LAW ⚖313—DATE FOR REGISTRATION OF DRAFTEES—KNOWLEDGE
—PRESUMPTION.

It must be presumed that the grand jurors were cognizant of the fact
that the day originally set for registration of persons subject to draft
was June 5, 1917.

10. ARMY AND NAVY ⚖40—OBSTRUCTING ENLISTMENT—INDICTMENT.

An indictment for a conspiracy to violate one of the provisions of Es-
pionage Act, tit. 1, § 3, held sufficient, although it did not state names of
persons whom conspiracy was designed to induce not to enlist, etc., or
allege that names were unknown to grand jury; it being manifest that
names of such persons could not be known to grand jury.

11. INDICTMENT AND INFORMATION ⚖71—SUFFICIENCY IN GENERAL.

An indictment is sufficient, where it acquaints defendants with the na-
ture and cause of the accusation and sets forth the charge with suffi-
cient definiteness to enable them to make their defense and to avail them-
selves of the record of conviction or acquittal against further prosecu-
tion, etc.

12. INDICTMENT AND INFORMATION ⚖101—NAMES OF THIRD PERSONS.

It is not always necessary that the names of third persons be set forth
in the indictment, or that there be an allegation that such names are
unknown.

13. ARMY AND NAVY ⚖40—OBSTRUCTING ENLISTMENT—INDICTMENT.

In prosecution for conspiracy to violate one of the provisions of Es-
pionage Act, tit. 1, § 3, by obstructing recruiting and enlistment service
of the United States by means of newspaper articles, indictment held
not subject to objection that it was defective, because not alleging that
the articles were intended to be publications which defendant might not
lawfully publish, or that they were untrue in fact.

⚖For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

14. INDICTMENT AND INFORMATION ☞150—DEMURRER—QUESTIONS PRESENTED.
    In prosecution for conspiracy to violate Espionage Act, tit. 1, § 3, by obstructing recruiting and enlistment service of the United States by means of newspaper articles, whether the means alleged to have been adopted would have accomplished the purpose is a question of fact, which cannot be passed upon on demurrer to the indictment.

Benedict Prieth and others were indicted under Espionage Act, tit. 1, § 4, for a conspiracy to violate one of the provisions of section 3 of said act. On demurrer to indictment. Demurrer overruled.

Charles F. Lynch, U. S. Atty., of Newark, N. J.

Otto A. Stiefel, Abram H. Cornish, and Harrison V. Lindabury, all of Newark, N. J., and Thomas P. Fay, of Long Branch, N. J., for defendants.

HAIGHT, District Judge. The indictment to which the defendants have demurred, is based on section 4, title 1, of the so-called "Espionage Act" of June 15, 1917 (40 Stat. 217, c. 30), and charges a conspiracy to commit the third specific crime set forth in section 3, title 1, of that act, before it was amended by Act May 16, 1918, c. 75. It contains but one count, and alleges, in substance, that subsequent to June 15, 1917, the defendants conspired "unlawfully and willfully to obstruct the recruiting and enlistment service of the United States, to the injury of the service and of the United States, through and by means of the printing and publishing at Newark,   *   *   *   and the circulating and distributing at Newark aforesaid and elsewhere throughout the United States, among persons who were then and there persons available and eligible for enlistment and recruiting in the military forces of the United States, as well as persons who then and there were liable to be taken into the service of the military forces of the United States, under the provisions of an act of Congress entitled [then follows a description of the Selective Service Act of May 18, 1917], a certain newspaper or publication called and known as the New Jersey Freie Zeitung, containing headlines and editorials and printed matter calculated and intended by the said defendants to induce said persons available and eligible for enlistment and recruiting in said military forces to fail and refuse to enlist for service therein, and to induce persons liable to military service pursuant to said act of Congress approved May 18, 1917, to refuse to submit to registration and draft for service in the military forces, to the injury of the service and of the United States"; that thereafter, at various times between June 16, 1917, and October 1, 1917, to effect the object of the conspiracy, they caused a number of articles to be printed in the before-mentioned newspaper, and the latter to be put in circulation through the mails and otherwise. The articles, together with the dates of publication, are all set forth in the indictment. Many grounds of demurrer have been assigned, but they raise comparatively few questions, which will hereafter appear.

[1] 1. It is urged, primarily, that the provision of section 3, title 1, of the "Espionage Act," which the indictment alleges that the conspiracy sought to violate, cannot be violated by merely inducing persons to refrain from enlisting; that it contemplates only such obstruc-

tions as are in the nature of a tort, directed either against the persons actually engaged in the "recruiting or enlistment service" or "the service itself." Hence it is argued that, as the indictment alleges that the conspiracy was to induce those eligible for enlistment, etc., not to enlist, and in no way contemplated any acts which would constitute a tort or torts to "the service" or those engaged in it, it does not charge a crime. It is further insisted that, if that construction of the act is not tenable, and it can be violated by inducing eligible persons not to enlist, still the indictment charges no crime, because an obstruction, within the meaning of the act, must be directed to a concrete case or cases, and not generally, as the indictment in this case alleges, and must be of a coercive, threatening, or intimidating nature. These contentions are so closely associated that they may be properly considered together. I can find nothing in the act which would warrant any such constructions as the defendants urge. It is only applicable when the United States is at war, and at that time the government is chiefly interested in procuring men for the army and navy.

[2] It may at the outset, therefore, be safely assumed that the evil which Congress wished to prevent, by enacting the provision in question of the act, was the placing of obstacles in the way of raising an adequate army and navy, an urgent and pressing necessity, and that it was not concerned with the means which might be devised to obstruct recruiting or enlistments. Hence to adopt either of the defendants' constructions would be to attribute to Congress an intent entirely inconsistent with the manifest purposes of the act. Of course, no such construction should be adopted, unless the language used clearly requires it. But it does not. The verb "obstruct" is broad. It is defined in Webster's New International Dictionary (among other definitions) as synonymous with "to impede, retard, embarrass, oppose," and as "to be, or come, in the way of; to hinder from passing, action, or operation; to stop, impede, retard"; and such has been the construction generally given to it when it has been used in other federal penal statutes. See, for instance, United States v. Williams, Fed. Cas. 16,705; United States v. McDonald, Fed. Cas. 15,667. It thus follows that anything which would impede, hinder, or embarrass the "recruiting" service would "obstruct" it.

The contention that only such obstructions are within the act as are in the nature of torts committed against the persons actually engaged in the "recruiting service" is stated by counsel to be based on the use of the words "willfully" and "injury." Conceding that the meaning of those words is generally as counsel contends, I am nevertheless utterly unable to comprehend how, under any reasoning, the conclusion sought to be drawn therefrom is justifiable. Those words simply require that an obstruction, to be criminal, shall, on the one hand, be intentionally caused, with the evil purpose of obstructing the recruiting service, and, on the other hand, that it be injurious to the nation, or "the service," or both. It certainly requires no argument to demonstrate that the "enlistment or recruiting service" would be quite as much obstructed, and it and the United States as severely injured, by inducing eligible persons, through newspaper articles, persuasion, or any kindred means,

not to enlist, as by an assault upon a recruiting officer, the demolishment of a building in which a recruiting office is located, the tearing down or defacement of recruiting posters, or by actually intimidating prospective recruits. Indeed, the former means would probably be more effective than any of the latter.

The arguments that only such obstructions as are directed at a concrete prospective recruit, and then only when threats, etc., are employed, proceed, respectively, on the theory that this act should be construed the same as prior statutes which prohibit the obstructing of "an officer in the courts of the United States," and that decisions in labor injunction cases are applicable. If it be assumed for purposes of argument that the last-mentioned statutes have under all circumstances been construed as narrowly as counsel contend, that affords no reason for so construing the statute in question. Neither the language nor the purpose of the latter justify any such construction. There is no analogy between labor injunction cases and recruiting for the army and navy, save the right to freely contract. But the government has undoubtedly the additional right, which those decisions do not recognize that the employer has, to prevent any and all interferences with its raising of an army, no matter what they may be.

[3] There is no merit in defendants' contention that the act, construed as I have construed it, would be, in effect, an act to regulate the press. The press has no more of a constitutional right, when the country is at war, to willfully induce available persons not to join the army and navy, than an individual has to stand in front of a recruiting office and urge prospective recruits not to enlist, or by force, coercion, or intimidation attempt to keep them away, or otherwise actually interfere with the recruiting officers. The press, in its very nature, reaches a great many people and in a great many ways and places. To attribute to Congress an intention to make it criminal only when an obstruction is aimed at a concrete individual, and consists of threats, coercion, or intimidation (which could be easily frustrated by the police or military authorities), would necessarily presuppose that Congress intended that an evil-intentioned press, which is capable of being one of the most effective weapons against recruiting—a weapon which reaches the prospective recruit in his home, either directly or indirectly, when he is freer from the enthusiasm which pervades a community in times of war than when he is mingling with other men—could, with impunity, do anything it saw fit to obstruct recruiting. It would be ridiculous to think that Congress ever had any such intention.

Moreover, there has been no case, as far as I have been able to ascertain, where any judge has adopted any such narrow construction of the act in question as the defendants contend for, or any case in which it has not been held, in one way or another, that any willful act, no matter what it was, which was designed to, and the effect of which was to, obstruct recruiting and enlistment, whether it was aimed at a particular person or the public generally, is a violation of this provision of the Espionage Act. Some of the cases (most of them being charges to the jury, reported in the bulletins issued by the Department of Justice) which have so construed the act are as follows: United States v. Wal-

lace, Bulletin No. 4 (D. C. S. D. Iowa); Masses Pub. Co. v. Patten, 246 Fed. 24, 158 C. C. A. 250, L. R. A. 1918C, 79, Ann. Cas. 1918B, 999; U. S. v. Olivereau, Bulletin No. 40 (D. C. W. D. Wash.); U. S. v. O'Hare, Bulletin No. 49 (D. C. N. Dak.); U. S. v. Hitt, Bulletin No. 53 (D. C. Colo.); U. S. v. Doe, Bulletin No. 55 (D. C. Colo.); U. S. v. Tanner, Bulletin No. 56 (D. C. Colo.); U. S. v. Wolf, Bulletin No. 81 (D. C. S. D.); U. S. v. Frerichs, Bulletin No. 85 (D. C. Neb.); U. S. v. Hendricksen, Bulletin No. 86 (D. C. Neb.); U. S. v. Stokes, Bulletin No. 106 (D. C. Mo.); U. S. v. Rhuberg, Bulletin No. 107 (D. C. Or.); U. S. v. Taubert, Bulletin No. 108 (D. C. N. H.); U. S. v. Sandvick, Bulletin No. 113 (D. C. Alaska); United States v. Pierce (D. C. N. D. N. Y.) 245 Fed. 886. It seems to me, therefore, that an obstruction such as the indictment in this case alleges that the conspiracy was formed to effectuate is within the act.

[4] 2. As before noted, the indictment alleges that the object of the conspiracy was to obstruct the "recruiting and enlistment service" by inducing not only volunteers not to enlist, but also to induce persons liable to be drafted into military service, pursuant to the Selective Service Act of May 18, 1917 (40 Stat. 76, c. 15), "to refuse to submit to registration and draft." It is urged that the provision in question of the Espionage Act has reference only to voluntary enlistments, and the machinery and "service" set up by law to procure the same, and consequently does not embrace the "Selective Draft Service," or persons subject to the provisions of the Selective Service Act. Hence it is argued that the indictment is defective, in that it alleges a conspiracy to obstruct the "draft" and also a conspiracy to obstruct voluntary enlistments; both objects being so connected in the indictment that they cannot be separated, so that one may be discarded as surplusage. I think that this latter proposition is well founded if the premise on which it rests is correct.

The question, therefore, is whether "the recruiting or enlistment service of the United States," referred to in the provision in question of the Espionage Act, embraces the "service" created by the Selective Service Act. One's first impression from a mere reading of section 3 of title 1 of the Espionage Act might readily be that the "service" intended was that which has to do with procuring voluntary enlistments. But, of course, a statute should not be construed on a mere superficial impression. The decisions rendered prior to the passage of the Espionage Act afford little assistance on this question. In Babbitt v. United States, 16 Ct. Cl. 202, it was held that the word "enlistment" was of technical origin, derived from Great Britain, and had reference only to a voluntary acknowledgment to serve as a private soldier for a certain number of years. On the other hand, the Supreme Court of Massachusetts, in Sheffield v. Inhabitants of Otis, 107 Mass. 282, held that the word "enlisted," in a Massachusetts statute which dealt with the question of settlement of those who had enlisted in the War of the Rebellion, referred to drafted men as well as volunteers. Nowhere in the statutes, so far as diligent and able counsel have been able to ascertain, is "the recruiting service" or "the enlistment service" spoken of in terms, although the machinery for procuring "recruits" by vol-

untary enlistment is provided for. U. S. Comp. Stat. 1916, vol. 4, pp. 3610, 3799, 3800, 3810. The expression "the recruiting or enlistment service of the United States," so far as the literal meaning of the words used is concerned, may as well apply to both the "service" created by the Selective Service Act and that which has to do with securing voluntary enlistments as to either. It will be noticed that the word "or" is used. Both services are created for the same ultimate purpose, the raising of an army; the only differences being in the personnel of those composing them and the methods employed by each, respectively.

[5, 6] It is necessary, therefore, in order to ascertain the intention of Congress, to resort to other means than the literal meaning of the words used. The section in question of the statute is, as Judge Aldrich said in United States v. Taubert, Bulletin No. 108, "very broad and comprehensive." The Selective Service Act speaks (section 6) of "enlistment" in connection with the compulsory service therein provided for, and of "voluntary enlistments" (section 7) in connection with the provisions of the act which have to do with such enlistments, thus manifesting, I think, an intention on the part of Congress to use the word "enlistment" in a broad and comprehensive sense. One becomes "enlisted" in the military or naval service, whether he volunteers or whether he is drafted. The Selective Service Act fails to prohibit or provide any punishment for one who obstructs the draft, except for those charged with the duty of executing the law, or persons subject to draft, or to those aiding others to evade the draft. That act was passed almost a month before the Espionage Act, although the latter was introduced some two weeks before the former. On April 19, 1917, the Committee on Military Affairs favorably reported the Selective Service Act, and an effort was made by the chairman of the committee to have it immediately considered; but it was held up so that the Espionage Act might be considered (Congressional Record, vol. 55, p. 879). On April 20, 1917, Senator Lodge introduced, as an amendment to what subsequently became section 3 of title 1 of the Espionage Act (which, as reported, contained no provision regarding obstructing recruiting or enlistments), the following clause:

"Or shall interfere with or obstruct the recruiting or enlistment service of the United States." Volume 55, No. 16, Congressional Record, p. 879.

That amendment, in the form now found in the act, was subsequently adopted. It is therefore apparent that Congress, having before it the Selective Service Act, which contained no provision to prohibit the obstructing of the "service" thereby created, except as before stated (which will hereafter be shown to be manifestly inadequate to deal with the most dangerous and insidious obstructions), deliberately inserted the clause in question in that part of the "Espionage Act" which sought to prevent interference with the military forces and efforts of the nation, and thereafter passed the Selective Service Act without attempting to provide in it for any outside obstructions to the draft.

The irresistible conclusion to be drawn from these facts seems to me to be that Congress intended, by the clause in question, to pro-

hibit any willful obstruction to the government in its efforts to raise an army to effectively deal with the crisis which confronted the country and the world, whether it be directed against voluntary enlistments or the draft. As it was not concerned with the means employed to obstruct, neither was it concerned with the particular branch of the "recruiting" service any obstruction might be aimed at. It is inconceivable that Congress intended to prevent any obstruction to voluntary enlistment, and to leave unscathed those who would obstruct the workings of the draft law, when it is considered that it had committed the country to the policy of raising an army by draft, and when there had been persistent opposition to that method on the part of some classes which might reasonably be expected thereafter to endeavor to obstruct it. Strength is afforded to this conclusion, I think, from the fact that section 3 of title 1 of the Espionage Act was amended recently (May 16, 1918), so as to be much more comprehensive than before, and yet no change was made in the clause in question, except to add the words "attempt to obstruct," and to eliminate the words "to the injury of the service or of the United States." The latter clause was in the act before the clause "obstruct the recruiting or enlistment service of the United States" was inserted, and therefore related back to and qualified each of the preceding interdicted acts.

Considering the thoroughness with which the whole section was revised, and that the Selective Service Act contained no provision to prevent obstructions to it, except in the ways before indicated, although many attempts to obstruct it had been made in the meantime, it is difficult to understand why, if Congress did not consider that an obstruction to "the enlistment or recruiting service" covered an obstruction to the draft, some attempt was not made, in the amendment, to cover obstructions to the draft specifically. An argument to the effect that Congress had, by the clause in section 3, title 1, of the Espionage Act, prohibiting the causing or attempting to cause insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States," covered obstructions to the operation of the Selective Service law, on the theory that all who are registered are in the military forces, although not actually called or inducted into military service, as a number of the judges have held—United States v. Sugarman, Bulletin No. 12 (D. C. Minn.) 245 Fed. 604; United States v. Capo, Bulletin No. 37 (D. C. Porto Rico); United States v. Olivereau, Bulletin No. 40 (D. C. W. D. Wash.); United States v. Wolf, Bulletin No. 81 (D. C. S. D.); United States v. Frerichs, Bulletin No. 85 (D. C. Neb.); United States v. Stokes, Bulletin No. 106 (D. C. Mo.); United States v. Rhuberg, Bulletin No. 107 (D. C. Or.); United States v. Sandvick, Bulletin No. 113 (D. C. Alaska)—would not be an answer to the argument, above advanced, regarding the unreasonableness of attributing to Congress an intention not to prohibit obstructions to the draft, because the selective draft service could be obstructed in many ways besides acting immediately on those subject to be inducted into the service through the machinery of the draft.

[7] Nor, for the same reason, as well as others, is there any force in the argument that, because a prosecution could be had under section 37 of the Penal Code (Act March 4, 1909, c. 321, 35 Stat. 1096 [Comp. St. 1916, § 10201]) for a conspiracy to induce one "to willfully fail to register or present himself for registration or submit thereto," as has been done in several cases which arose before the Espionage Act was passed (see Goldman & Berkman v. United States, 245 U. S. 474, 38 Sup. Ct. 166, 62 L. Ed. 410), the clause in question of the Espionage Act has no reference to the Selective Service Act. Section 37 is applicable only to conspiracies, and therefore does not cover the case of one, acting alone, who induces another, subject to the provisions of the act, to fail to register, etc. Moreover, the question has been directly considered in United States v. Hitt, Bulletin No. 53 (D. C. Colo.). While the only report of that case which I have seen is the charge of Judge Lewis to the jury, he not only specifically charged that an obstruction to the draft was a violation of the act, but later, when the question was specifically raised by counsel, so held.

The charges in United States v. Capo, Bulletin No. 37 (D. C. Porto Rico); United States v. Schenck, Bulletin No. 43 (D. C. E. D. Pa.); United States v. Doe, Bulletin No. 55 (D. C. Colo.); United States v. Wolf, Bulletin No. 81 (D. C. S. D.); United States v. Rhuberg, Bulletin No. 107 (D. C. Or.); United States v. Taubert, Bulletin No. 108 (D. C. N. H.); United States v. Rutherford, Bulletin No. —— (D. C. E. D. N. Y.)—all contain expressions which indicate that the several judges who delivered them were of the opinion that an obstruction of the draft was a violation of the provision in question of the Espionage Act. On the other hand, in several jury charges, although there are no expressions indicating that the judges expressly considered that an obstruction of the draft was not within the statute, the only obstruction seemingly dealt with was that which was aimed at voluntary enlistments. United States v. Frerichs, Bulletin No. 85 (D. C. Neb.); United States v. Hendricksen, Bulletin No. 86 (D. C. Neb.; same judge as in United States v. Frerichs); United States v. Stokes, Bulletin No. 106 (D. C. Mo.). See, also, remarks in United States v. Pierce (D. C. N. D. N. Y.) 245 Fed. 878, 887. Those cases, however, shed very little light on the question, because it does not appear that the indictments were so framed as to permit the consideration of it, but, on the contrary, it would seem that the indictments covered only obstructions to voluntary enlistments.

The remarks in Franke v. Muray, 248 Fed. 865, 868, —— C. C. A. ——, to which counsel refer in support of their contention, are in no respect applicable. They had reference only to the fact that the decision in Re Grimley, 137 U. S. 47, 11 Sup. Ct. 54, 34 L. Ed. 636, did not apply to the situation which was then before the court and which arose under the Selective Service Act, a different act than was considered in the Grimley Case. My conclusion, therefore, is that the clause in question of the Espionage Act covers the obstructing of the operation of the Selective Service Act, except as to such acts as are specifically provided for in that act and which might possibly be said to be obstructions, as well as that branch of the military service, strict-

ly speaking, which is charged with the procuring of recruits by voluntary enlistment.

[8, 9] 3. It is further urged that the indictment shows on its face that there could have been no conspiracy to induce persons liable to service under the Selective Service Act to "refuse to submit to registration and draft," as it is alleged there was, because the conspiracy, according to the indictment, was formed after the time set for registration. Assuming that this argument is otherwise sound, it fails to recognize that there were many persons who were required to register at the time set by the President's Proclamation, but who did not do so. Provision for their subsequent registration was made in section 5 of the Selective Service Act. I think it entirely clear that the indictment, reasonably construed, charges that the conspiracy was to induce such persons to fail to register. It must necessarily be presumed that the grand jurors were cognizant of such a notorious fact as that the day originally set for registration was June 5, 1917.

[10, 11] 4. It is claimed that the indictment is defective, because it neither sets forth the names of the persons whom the conspiracy was designed to induce not to enlist and to refuse to submit to the draft, nor alleges that their names were unknown to the grand jury. Those whom the conspirators contemplated would be induced not to enlist were all eligible persons, to whose attention the newspaper articles should come, either directly or indirectly, and who would be affected by what was contained therein. Manifestly, in the very nature of things, the names of such persons would be unknown, either to the grand jurors or to the defendants. An allegation, therefore, that their names were unknown to the grand jurors, would have been idle and useless, so far as acquainting the defendants with the nature and cause of the accusation against them. That had already been sufficiently described. All that was required was that the indictment should acquaint the defendants with the nature and cause of the accusation, set forth the charge with sufficient definiteness to enable them to make their defense and to avail themselves of the record of conviction or acquittal, for their protection against further prosecution, and to inform the court of the facts charged, so that it might decide as to their sufficiency, in law, to support a conviction, if one should be had, and that the elements of the offense should be set forth with reasonable particularity of time, place, and circumstance. Armour Packing Co. v. United States, 209 U. S. 56, 83, 28 Sup. Ct. 428, 52 L. Ed. 681.

[12] The indictment, in every respect, meets the requirements of that rule. It is undoubtedly generally necessary, in order to comply with the before-mentioned rule, to set forth the name of the person or persons against whom, specifically, a crime has been committed—the person or persons to whom the injury has been done—or, if the names are unknown to the grand jurors, to so allege. But it is not always necessary that the names of third persons be set forth in the indictment, or that there be an allegation that they are unknown, if the indictment, in other respects, measures up to the rule above stated. Kirby v. United States, 174 U. S. 47, 62, 19 Sup. Ct. 574, 43 L. Ed.

809; State v. Cooney, 72 N. J. Law, 76, 60 Atl. 60, and cases cited in 12 Standard Encyclopædia of Procedure, p. 370, Note 15. I think the indictment in this case is within the latter class. The conspiracy alleged was not to injure any specific person or persons, but to obstruct the recruiting and enlistment service of the United States, to the injury of the country at large. The means by which this was to be done was to induce third persons, whose names could not, as before stated, be known, either to the grand jurors or the defendants, to decline to enlist. I think, therefore, that there was no need of an allegation in the indictment to the effect that the names of the persons whom the defendants conspired to reach were unknown to the grand jurors.

[13] 5. It is contended that the indictment is defective because it does not allege that the articles which the defendants conspired to publish, or those which they did publish, in furtherance of the conspiracy, are or were intended to be publications which the defendants might not lawfully publish, or that they were untrue in fact. But this contention completely ignores the allegations of the indictment that the "defendants willfully, unlawfully, and feloniously conspired to obstruct the recruiting and enlistment service * * * by newspaper articles * * * calculated and intended by the defendants to induce persons available not to enlist," etc. Without attempting to discourse upon the limitations of the "freedom of the press," it is sufficient, I think, to observe that the before-quoted words stamp the defendants' object as a felonious one, and make their conspiracy, under the statute, a criminal act. The propaganda such as these defendants, as would appear from the articles annexed to the indictment, were carrying on, ordinarily, was intended to be within the law and beyond the pale of punishment, as recent experience has taught. The test is, however, not whether the defendants thought that their publications were lawful or true, but whether they intended to accomplish a particular object, namely, the obstruction of enlistments and recruiting.

[14] 6. The other objections to the indictment I consider without merit, and to need no more than a passing reference. This indictment is not for a conspiracy to attempt to obstruct recruiting, but for a conspiracy to obstruct. Whether the means alleged to have been adopted would have accomplished the purpose is a question of fact, which cannot be passed upon on demurrer. It is worthy of note, however, that in many of the cases which have arisen under the Espionage Act, some of which are cited above, articles and words less objectionable than many of those which are set forth in the indictment in this case have been considered sufficient to permit a jury to find that they actually did obstruct "the recruiting and enlistment service," without any proof that particular individuals were actually induced thereby not to enlist.

My conclusion, therefore, is that the demurrer should be overruled.